No. 80,937

STATE OF KANSAS, *Appellee*, v. BRYON GREENE, *Appellant*.

(37 P.3d 633)

Opinion filed December 14, 2001.

*Debra J. Wilson*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Terra D. Morehead*, assistant district attorney, *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Bryon Greene appeals convictions of second-degree murder and aggravated battery. The issues raised by Greene are: denial of his Sixth Amendment right to effective assistance of counsel, limitation of the testimony of a defense witness, erroneous admission of a victim's statement, and failure to instruct on Greene's diminished capacity and on voluntary manslaughter.

Approximately a half hour after midnight on January 20, 1997, police were dispatched to 1139 Georgia in Kansas City, Kansas, where shooting had been reported. As police approached the address, they met up with an automobile in which one of the shooting victims was being transported. At 1139 Georgia, the police found another victim on the dining room floor.

Darius Flournoy was the victim found in the house. At the hospital where Flournoy was taken shortly after the incident, he iden-

tified the defendant as the person who shot him. Flournoy died during surgery. An autopsy revealed that a bullet had torn Flournoy's aorta and that he died from massive internal bleeding caused by the gunshot wound to his mid-abdomen. There was no exit wound. Another bullet had grazed Flournoy's neck.

Durand Womack was the other victim. After defendant shot Flournoy he turned the gun on Womack, who had put his hands in front of his face with the palms out. Defendant wounded Womack in both his hands and his mouth.

Police found two spent bullets in the house. An officer testified that the lack of shell casings at the scene would be consistent with a revolver being used to shoot Flournoy and Womack. There was a bloodstain in the doorway from the dining room that led toward the bathroom.

One of the occupants of the house was found by police passed out on the couch. The other occupant had gone to work at approximately 10 p.m and did not return until approximately 5 a.m. There were approximately 10 people in the house at the time of the shooting. Three or four women were in the living room. Most of the men were in the dining room where they were rolling dice for money on a blanket-covered table.

Greene admitted shooting Flournoy and Womack, but he claimed to have done so without forming the intention to kill or wound. Greene, who was 22 at the time of the shooting, and Flournoy were well acquainted from sharing a bedroom in a foster home for approximately a year-and-a-half when they were teenagers. Their foster mother testified that the boys had not gotten along because Flournoy was overbearing, made Greene do things for him all the time, and "kind of bullied him." Greene testified that when Flournoy moved in "It was like he became my pimp . . . ." Greene catalogued a number of brutish things Flournoy did to him, including threatening to make his life even more miserable if he told the foster parents what was going on and, on two occasions, making Greene suck his penis.

Womack and Greene told very different versions of the shootings. According to Womack, defendant pulled a gun from his pocket and began shooting without any provocation. Although de-

fendant admitted shooting at Flournoy and Womack, he claimed to have fired his friend's gun that was lying on the table and to have fired it in an instantaneous reaction to a psychologically devastating taunt by Flournoy.

Womack testified that he and Flournoy arrived at 1139 Georgia at approximately midnight. He did not participate in the dice game because he had no money. He said that he was seated in a chair watching the others roll dice. Flournoy was standing next to Womack. Defendant was standing. There was music playing. Defendant said something that Womack did not catch. Then immediately defendant pulled a gun out of his pocket and shot Flournoy before pointing the gun at Womack and shooting him.

Greene testified that he considered the gathering at 1139 Georgia to be a celebration because he had just learned that he was going to be a father. Greene told everyone at the house that he would buy the drinks, and he left to go to the liquor store. When he got back to 1139 Georgia with the drinks, Flournoy, Womack, and Greene's friend Mike were there. Greene and his friend later made another trip to the liquor store, and, before they reentered the house, Greene returned the gun Mike had asked him earlier in the day to carry. With Greene and his friend back, the men went into the dining room, put a blanket on the table, and started a dice game.

According to Greene, Womack was in and out of the game. Defendant told him to make up his mind. Womack decided to get out, and he left the room to go into the bathroom. Flournoy remarked on Greene's making Womack choose. Greene responded, "I'm not scared of you, I'm not a kid anymore." Someone told Greene and Flournoy to take their dispute outside. Then Flournoy threw names like "bitch ass nigger" at Greene and said, "He can suck this dick." At that, Greene hit the table in a rage, "flashed," and blacked out. His friend's gun, which was lying on the table, made a noise. Greene picked up the gun and shot Flournoy. Womack flung open the bathroom door, and it hit the wall. Greene pulled the trigger again.

Following his convictions, Greene's trial counsel filed a notice of appeal on January 30, 1998. Appellate counsel was appointed,

and the appeal was docketed on April 13, 1998. Since Greene's claim of ineffective counsel had not been heard by the trial court, appellate counsel, pursuant to *State v. Van Cleave*, 239 Kan. 117, Syl. ¶ 2, 716 P.2d 580 (1986), moved to remand for a determination of the defendant's claim of ineffective assistance of counsel. This court, on August 24, 1999, granted the motion but retained jurisdiction of the appeal. A hearing on the defendant's motion was held in the trial court on December 3, 1999. The matter was taken under advisement, and on September 18, 2000, the trial court denied the motion by memorandum decision. Appellate counsel filed a supplemental notice of appeal from that decision on October 2, 2000.

We first consider if Greene was denied his Sixth Amendment right to effective assistance of counsel. The principal contention was that trial counsel's failing to request a continuance when defendant changed his story during jury selection fell below prevailing professional standards and prejudiced him. After a hearing, the trial judge concluded that Greene's argument did not have merit:

"Defense counsel was actively pursuing an alibi defense and taking appropriate action to secure the attendance of alibi witnesses. Apparently, only upon learning that his fiancee and brother would not voluntarily come to court and provide false testimony, did defendant come clean with his lawyer. The pickle the defendant found himself in at that point was of his own making, not that of the lawyer's. The lawyer was forced to change horses in the middle of the stream which is not an easy thing to do. But the blame rests squarely on the shoulders of the defendant, not his lawyer."

There is no question that Greene created a very difficult situation for himself and his counsel. What is at issue, though, is whether Greene's defense attorney's actions in response to the difficult situation were deficient.

Greene lied to his attorney and caused his attorney to spend his trial preparation time pursuing a false and worthless alibi defense. Unable to secure the attendance of alibi witnesses, Greene's attorney requested a continuance on the morning trial was to begin. The request was denied, and voir dire commenced. Greene waited until jury selection was well under way before revealing to his attorney that he actually had shot both victims and that his prior

relationship with Flournoy was at the heart of it. When asked why he had not disclosed the sexual incidents to his attorney, Greene said:

"I felt I — you know, I felt I didn't have a chance regardless. I mean I kept it hid, one, because it's not something that you can just tell somebody. I mean, you know, that's — that's something that I thought would be put away forever, you know. I didn't — I didn't ever know that I was gonna have to ever come to this point."

In consequence, Greene's attorney learned for the first time during jury selection that his client had shot the victims and that Greene had a potentially significant past relationship with Flournoy. Not long before jury selection began, Greene's attorney's request for a continuance for the purpose of securing alibi witnesses had been denied by the trial court. In these circumstances, Greene's attorney did not request a continuance for the purpose of preparing a new defense.

The scope of an appellate court's review of the trial court's decision on an ineffective assistance of counsel question is de novo. *State v. Rice*, 261 Kan. 567, Syl. ¶ 16, 932 P.2d 981 (1997). It is well established that "[t]he proper standard for judging attorney performance is that of reasonably effective assistance, considering all the circumstances." 261 Kan. 567, Syl. ¶ 14. The complaining defendant must show that "counsel's representation fell below an objective standard of reasonableness." 261 Kan. 567, Syl. ¶ 14. Judicial scrutiny of counsel's performance must be highly deferential, must evaluate the conduct from counsel's perspective at the time, and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 261 Kan. 567, Syl. ¶ 14. Thus, the question for this court is whether Greene's attorney's performance in the circumstances fell below an objective standard of reasonableness.

Greene has cited a number of cases from other jurisdictions in which defense counsel's failing to request a continuance in order to come to grips with some new information or new development was found to deny a defendant's right to effective assistance of counsel. The need for a continuance in most of the cases cited by

Greene was due to the prosecution's delay in turning over evidence or the unavailability of witnesses.

The State urges and the trial court seemed to have assumed that the inquiry was over when it was determined that it was the defendant's own failure to timely reveal the truth that necessitated a continuance in order to prepare an estimable defense. No authority was cited by either the trial judge or the State for this position, nor has our research revealed any.

In this same vein, the State goes even further and asserts that an "obligatory ethical complaint" about counsel's deficient performance must be made to the Disciplinary Administrator. There is no such requirement. There is no allegation of any ethical deficiency in counsel's representation of Greene. A claim of ineffective assistance of counsel is not a condemnation of counsel. Instead, its purpose is to ensure a defendant's constitutionally protected right to a fair trial.

One of the many cases cited by Greene involved a defendant's delayed disclosure creating the need for a continuance. See *Gates v. State*, 393 N.W.2d 417 (Minn. App. 1986). Gates waited until 2 days before trial to disclose to his attorney that someone named Mickey Johnson committed the crime Gates was charged with. Gates' attorney proceeded to trial rather than requesting a continuance. The Court of Appeals had viewed the failure as one of many making up a deficient performance. The Minnesota Supreme Court, however, reversed the decision of the Court of Appeals on the ground that the defendant had not met his burden of proving prejudice. 398 N.W.2d 558 (Minn. 1987).

Gates' attorney's failure to make the necessary adjustments when confronted with an unforeseen, although perhaps foreseeable, event typifies the performance deficiencies in the cases that support Greene's position. The common thread is counsel's failure to deviate from the planned course of action as new or unexpected matters arose. Trial by ambush has been eclipsed by modern procedural rules and practices, but trials are human affairs, hence, not entirely predictable. From a number of other states' courts, Greene cites cases in which defense counsel failed to exercise flexibility in reacting to something unplanned and in which the court consid-

ered pliancy to be necessary for reasonably competent representation.

In *People v. Mejia*, 247 Ill. App. 3d 55, 617 N.E.2d 799 (1993), the State waited until trial was under way to give timely requested police reports to defense counsel. One of the reports was exculpatory and contradicted other testimony. Defense counsel failed to request a mistrial or continuance. The court held that the defendant was deprived of effective assistance when, among other things, defense counsel stipulated to contradictory key witness testimony rather than calling for impeachment testimony. 247 Ill. App. 3d at 63-66. In another Illinois case, the court concluded that defense counsel's failure to react positively to being informed by the State of a witness who may have had exculpatory evidence denied the defendant effective assistance of counsel. See *People v. Pitts*, 257 Ill. App. 3d 949, 951-52, 629 N.E.2d 770 (1994), where defense counsel did not request a recess to talk to the witness, decided it was too late to issue a subpoena, and did not request a continuance. In *Commonwealth v. Brookins*, 33 Mass. App. 626, 603 N.E.2d 916 (1992), a properly subpoenaed defense witness failed to appear the second day when his testimony carried over from one day to the next. Defense counsel did not request a continuance for the purpose of securing attendance of the witness. In *Farmer v. State*, 321 Ark. 283, 287-88, 902 S.W.2d 209 (1995), Farmer's attorney failed to secure the appearance of the only witness available to corroborate the defendant's self-defense claim, and he failed to request a continuance when the witness failed to appear. In *Commonwealth v. Hillman*, 465 Pa. 541, 351 A.2d 227 (1976), defense counsel learned at trial of certain discrepancies in a lineup, and in the face of new information defense counsel failed to request a recess or continuance to investigate the circumstances of the lineup.

The performance of Greene's counsel is comparable to the deficient performances discussed in the above cases. A notice of alibi had been filed on behalf of Greene, and his trial attorney appropriately attempted to secure attendance of two alibi witnesses. Then during jury selection, Greene nullified all his attorney's trial preparation by admitting that he had shot Flournoy and Womack.

When confronted with his client's admission, Greene's attorney did not withdraw the notice of alibi and did not request a continuance. His inaction allowed the prosecuting attorney in opening statement to tell the jurors that defendant had filed a notice of alibi, which stated that defendant would produce evidence that he was at 10105 Belmont in Grandview, Missouri, at the time the shootings occurred. Defense counsel in his opening statement corrected the jurors' expectation as to that evidence by telling them the evidence actually would be that Greene shot the victims rather than that he was nowhere near the scene, as previously claimed, but nothing counsel said could repair the injury to the defendant's credibility. Learning before the evidence even began that the defendant had not been truthful, the jury in all likelihood was predisposed to disbelieve him so that it filtered Greene's testimony through a fine mesh of skepticism.

In addition to detrimentally affecting defendant's credibility with the jury, counsel's inaction did not allow for appropriate preparation of the defense. At the time of opening statement, defense counsel told the jury of the hostile teenage relationship between Greene and Flournoy. Counsel told the jury that Greene "snapped" when Flournoy's taunts dredged up the horrible memories. Counsel also told the jury that Greene "wanted to hurt [Flournoy], he wanted to get back for all the terrible atrocities that he had experienced as a young boy. Counsel's message was mixed, at best. The jury was told in one breath that Greene did not intend to kill Flournoy and in the next breath that Greene had a motive for killing Flournoy. Then, testimony elicited from Greene reinforced the impression of both. This dichotomy between Greene's having a reason to kill his old nemesis and killing him without intending to was bridged nicely by the testimony of a psychiatric expert witness during the post-conviction proceedings, but the jury did not hear that testimony.

At the remand hearing, Dr. John Wisner testified that Greene was given up by his birth mother, then adopted and later given up by his adoptive mother, and spent his childhood in institutional placements and eventually in foster-home placements. His records showed low-normal to borderline intelligence, coupled with broad

and significant lags in functions controlled by the central nervous system. Dr. Wisner said that when Greene was tested as a 10-year-old, his motor function was at the level of a 6-year-old. Greene also had significant psychiatric problems that excluded him from regular schools and foster homes so that he was hospitalized and medicated.

Dr. Wisner offered the opinion, as a forensic psychiatrist and expert witness, that Flournoy's taunting Greene with words like "bitch ass nigger" and saying, "He can suck this dick," caused the defendant to flash back to his previous subjugated position relative to Flournoy. Dr. Wisner testified that he would expect the emotional impact of the vivid reminder of not being able to protect his own integrity to preclude Greene's forming the intent to kill Flournoy. He regarded it as quite plausible that at that moment Greene lacked the capacity to form the intent to kill and just reacted, lashing out, to hurt someone or somehow protect himself. He concluded: "I think this is psychiatrically, this is almost a definition of what we've brought to the courts as things like crimes of passion, things like moments of overwhelming impulse, et cetera, all of which really adds up to . . . reduced ability to form a specific intent or appreciate outcomes and consequences." With his expertise, Dr. Wisner offered an explanation that helped harmonize evidence that Greene simultaneously had a motive for killing Flournoy and killed him without intending to do so. The jury did not hear this explanation because there was no time for defense counsel to prepare an adequate defense.

With regard to Greene not having the intent to kill Flournoy, Greene's attorney requested a jury instruction on diminished capacity based on *State v. Jackson,* 238 Kan. 793, 714 P.2d 1368, *cert. denied* 479 U.S. 821 (1986). In *Jackson,* the court recognized diminished capacity to commit a crime as a mental state not amounting to insanity. Insanity would negate criminal responsibility; diminished capacity would not negate criminal responsibility, but it would negate specific intent. 238 Kan. at 798.

Neither an insanity defense nor diminished capacity, as described in *Jackson,* are applicable to crimes committed after January 1, 1996. See K.S.A. 22-3220. The crimes at issue were com-

mitted on January 20, 1997. The current statutory scheme replaced the term "insanity" with the phrase "mental disease or defect" and provides that it is a defense only if, as a result of his mental condition, a defendant lacked the mental state required as an element of the offense charged. K.S.A. 22-3220. It requires a jury that has returned a not guilty verdict in a case involving substantial evidence of mental disease or defect in a defendant to answer a special question formulated to ascertain whether mental disease or defect was the sole reason for the verdict. A special verdict stating that defendant's mental condition was the sole reason for the verdict triggers automatic hospitalization. K.S.A. 2000 Supp. 22-3428. If the defendant is found not guilty of the charged crime, the special question is answered in the affirmative, and if the defendant is also found guilty of a lesser included offense, the trial judge may order the defendant committed for mental examination before sentencing. K.S.A. 22-3222; K.S.A. 22-3429.

In the present case, the trial judge refused to instruct the jury on the *Jackson* concept of diminished capacity, not on the ground that it had been superseded but rather because he did not believe "there was any evidence presented that would support an instruction on diminished capacity." The refusal to instruct is the subject of another question on this appeal. Relative to defense counsel's failure to request time to adequately prepare the defense, we note that Dr. Wisner's testimony would have supplied evidence of defendant's mental state being altered in reaction to Flournoy's taunting words.

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *Chamberlain v. State,* 236 Kan. 650, Syl. ¶ 3, 694 P.2d 468 (1985). The measure of prejudice "requires the defendant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 236 Kan. 650, Syl. ¶ 3. In the present case, the question

boils down to whether defendant has shown that there is a reasonable probability that the combination of the jury's not being predisposed to disbelieve defendant and Dr. Wisner's expert testimony would have changed the outcome.

A jury that did not know that defendant had changed his story ought to give the evidence a properly unbiased hearing. Such a jury would hear the testimony of the psychiatrist to the effect that defendant shot Flournoy without intending to kill him. Dr. Wisner also would tell the jury that he would not have expected a person of defendant's psychological capacity to assume control and leave the party because Flournoy showed up. On the other hand, the jury would hear evidence that creates doubts about Greene's intentions. Some of that evidence was the State's evidence, but much of it was not. There is Greene's own testimony, "I was really trying to scare [Flournoy]," which might imply thinking rather than pure reaction. The word "scare" was used by defense counsel in the question to Greene, and, because the surrounding testimony gives the impression of a thoughtless reaction rather than a calculated response, perhaps the testimony should be regarded as aberrant and a reflection of defense counsel's question rather than defendant's state of mind. The jury undoubtedly would question the truthfulness of Greene's testimony that shortly before the dice game he gave the gun that had been in his pocket to his friend, and the jury would take into account Womack's testifying that Greene pulled the gun from his pocket. A jury that concluded Greene brought the gun to the dice game probably would be less likely to give credence to the theory that he did not intend to kill Flournoy.

Although Greene's trial counsel did not create the difficult situation in which he found himself, he compounded the adverse effect it had on Greene by failing to inform the court of the situation and asking for a continuance. Greene's lying to his counsel is a factor to be weighed along with all the other factors. A question of ineffective assistance of counsel is not an equitable doctrine that requires having clean hands. The effective assistance of counsel is constitutionally guaranteed. A trial in which the notice of alibi was not revealed to the jury and in which expert psychiatric testimony was offered on behalf of Greene would be a quite different trial

from the one Greene received. Because the testimony of Dr. Wisner could exonerate defendant of intentional second-degree murder, we are convinced that there is a reasonable probability that the outcome would have been different. We hold that Greene has shown that trial counsel's assistance was deficient, and that deficient performance deprived Greene of a fair trial.

In view of the foregoing, it is not necessary to consider the remaining issues raised by Greene. Reversed and remanded for a new trial.

McFARLAND, C. J., dissenting.