No. 90,661

STATE OF KANSAS, *Appellee*, v. BOBBY BRUCE WHITE, *Appellant*.

109 P.3d 1199

Opinion filed April 22, 2005.

*Michelle Davis*, assistant appellate defender, argued the cause and was on the brief for appellant.

*James R. Watson*, assistant county attorney, argued the cause, and *Jan Satterfield*, county attorney, and *Phill Kline*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: A jury convicted Bobby Bruce White of first-degree premeditated murder for the shooting death of his son-in-law, and the district court sentenced him to a hard 25 life sentence. He appeals pursuant to K.S.A. 22-3601(b)(1) (conviction of off-grid crime).

The issues on appeal, and this court's accompanying holdings, are as follows:

1. Did the district court violate White's due process right to present his defense by refusing to allow White's expert to testify, by failing to instruct the jury regarding the defense of mental disease or defect, and by instructing the jury that mental disease or defect was not a defense? Yes.

2. Does K.S.A. 22-3219 unconstitutionally abrogate the insanity defense? No.

3. Did the prosecutor's misstatements of the law in closing argument deny White a fair trial? No.

4. Did the district court err by failing to instruct the jury on heat of passion voluntary manslaughter? No.

5. Did the district court's instruction that the jury could only consider voluntary manslaughter if the jury did not agree on first-degree murder violate due process? No.

6. Did cumulative error substantially prejudice White and deny him a fair trial? Moot.

Because of error on issue one, we reverse White's conviction and remand for a new trial.

## FACTS

On March 27, 2002, Bobby Bruce White drove from his home in Great Bend to the Wal-Mart store in Augusta. Once inside, he walked directly to the electronics department where his son-in-law, Aaron Ruboyianes, was working. He killed Aaron with three shots from a handgun. White then walked directly out of the store to the parking lot, where the police apprehended him a few minutes later.

After White was charged with first-degree premeditated murder, he filed notice pursuant to K.S.A. 22-3219 of his intent to rely on the defense of lack of mental state or mental capacity. Dr. Marilyn Hutchinson later performed a psychological evaluation of White and issued a 15-page report dated October 21, 2002. Among other things, Dr. Hutchinson found that White suffered from major depression.

On December 30, the State filed a motion to disqualify Dr. Hutchinson and disallow her expert testimony. After a response by White, the district court held a hearing on January 6, 2003.

The next day, the court held that the defense failed to relate White's mental disease or defect to the lack of the mental element required in the offenses charged. Accordingly, the district court found that Dr. Hutchinson's report and proffered testimony fell short of what K.S.A. 22-3220 requires, and the court granted the State's motion to exclude.

White then filed a motion to reconsider on January 10, claiming that K.S.A. 22-3220 violates due process under the United States

and Kansas Constitutions and that refusing to allow him to present his theory of defense was error. The motion was denied.

At the subsequent trial, the State produced five witnesses to the shooting. The identity of the shooter was never at issue. Witnesses, security videotape, and forensic evidence established that White shot Aaron once in the abdomen, once in the upper chest, and lastly, as Aaron was lying on the floor, once in the head. One witness testified that after the shooting, the shooter — with the gun still in his hand — walked calmly outside the store and across the parking lot in the direction of the police station two blocks away. An additional witness testified that White set the handgun on the ground, took off his coat and laid it on the ground, and the police apprehended him without incident.

Much of the testimony during the 6-day trial focused on the relationships in the White family. White and his wife Mary have two daughters, B.W. and Wendy. When B.W. was 20, she gave birth to a son, B.A.W. B.W. and B.A.W. lived with her parents for a few months, moved in with B.W.'s boyfriend for a few months, and then returned to live with the Whites until 1998.

By 1998, B.W. had begun dating Aaron. After a few weeks, she moved out, leaving B.A.W. with her parents. On January 8, 1999, she voluntarily signed papers allowing her parents to have guardianship rights for B.A.W. In September 1999, the Whites moved to Arkansas for Bobby White's new job, taking B.A.W. with them. They asked B.W. to move with them, but she declined.

On October 2, 1999, Aaron and B.W. were married. They moved to Augusta in April 2000, and the Whites moved there with B.A.W. soon after. At that time, B.W. and Aaron began sharing custody of B.A.W. with her parents. In December 2001, the Whites moved to Great Bend for Bobby White's new job and wanted to take B.A.W. with them.

The Whites had concerns about how Aaron treated B.A.W. Aaron would give "wedgies" by pulling up on the back of B.A.W.'s underwear. Wendy White testified that during one of these episodes B.A.W. was screaming and his feet were lifted off the ground. Bobby White testified that B.A.W. mentioned a couple of times

about Aaron "hurting his pee-pee." Also, when B.A.W. would go to the bathroom, Aaron would follow him in.

According to White, one time when B.A.W. came to the house B.A.W. told him that his bottom hurt. Upon examination, B.A.W. had feces caked to his bottom. When B.W. asked B.A.W. why he did not tell her, he would not answer. At one point, Mary White told B.A.W. to tell her if anyone touched him inappropriately.

The Whites' other concerns involved Aaron lifting B.A.W. by the arm; Aaron shaking B.A.W.; Aaron putting B.A.W. in time-out; Aaron taking B.A.W. to a chiropractor; Aaron and B.W. occasionally leaving B.A.W. at home alone; and pets in the Ruboyianes' house.

Bobby White testified that one day in October or November 2001, he went to the Ruboyianes' house and saw some disturbing pictures taken on a digital camera. One picture was of B.A.W. standing in a bathtub urinating; a second was of him naked on the toilet; a third was of him standing by the door naked as if waiting on something; and the fourth was of Aaron standing with an erection near B.A.W.'s face. White testified that he confronted Aaron, who grabbed the camera and went into the bathroom.

A month or so later, in December 2001, B.W. hired an attorney to terminate the Whites' guardianship. At the hearing to terminate on January 10, 2002, the attorneys reached an agreement in which temporary custody would be transferred to B.W., she would try to get rid of pets to which B.A.W. was possibly having allergic reactions, and the hearing to terminate the guardianship would be reset for another 30 days. On January 12, the Whites visited the Ruboyianes' home and found the pets still there. They believed this was contrary to their agreement, called the police to remove B.A.W. from the Ruboyianes' home, and fired their attorney. However, B.A.W. remained in the Ruboyianes' home.

At the hearing on March 25, 2002, the district court terminated the Whites' guardianship. Bobby White said that he did not get to testify at a hearing because "they had outsmarted me." Among other things, he had intended to raise the issue of the disturbing digital pictures of B.A.W. Mary White confirmed that neither she nor her husband was ever allowed to testify regarding their con-

cerns about B.A.W. She testified that her husband was upset after this hearing, but would not talk about it with her.

On March 26, 2002, the day after the Whites' guardianship of their grandson was terminated, Bobby White drove from Great Bend to the Wal-Mart in Augusta, a 2-hour drive. He testified that he went to Augusta to see B.A.W., but when he realized B.A.W. was at the babysitter's house, he left. White testified that he was thinking about leaving his wife and his family to go to Texas or someplace similar, but he changed his mind when he realized that he had no money, that he did not have the title to his truck, and that he could be tracked down with his credit card. He returned to Great Bend that afternoon.

According to Bobby White's testimony concerning the next day, March 27, he remembered getting up and going to work. The next thing he remembered was walking out of Wal-Mart with a gun in his hand. White further testified that he did not plan to kill Aaron and did not remember getting in his car, driving to Augusta to kill Aaron, or loading the gun. He had no recollection of how long he was in the police car after his arrest because he was unconscious part of the time.

The jury was given instructions on first-degree premeditated murder, second-degree murder, and voluntary manslaughter based on an unreasonable but honest belief that circumstances existed that justified deadly force in defense of another person, *i.e.*, B.A.W. There was no instruction requested or given on the defense of mental disease or defect.

During its deliberations, the jury submitted the following question to the Court: "We have a concern about the emotional/mental well-being of the defendant at the time of the shooting. Is this something we should consider as we do not recognize this as being part of the evidence?"

The court responded:

"To that question the Court provides the following answer and instructs you as follows: Under Kansas law, mental disease or defect may be an absolute defense to criminal responsibility under certain circumstances. In this case you were not given a jury instruction concerning this defense and, therefore, you may not consider mental disease or defect as an absolute defense in this case.

"Nonetheless, as part of your deliberations in this case, you should consider and weigh any evidence that you find to exist regarding the defendant's state of mind at the time of the shooting as that evidence may affect your determination as to whether the State has met its burden of proving the claims set out in Instructions 4 [first-degree premeditated murder], 6 [second-degree murder], and 7 [voluntary manslaughter]. This evidence should be considered and weighed by the same standards as all of the evidence in this case. In that regard, please refer back to Instructions 1 [prefatory], 2 [reasonable doubt], 3 [witness credibility], and 4A [person ordinarily intends all. of the usual consequences of his or her voluntary acts]."

The jury found Bobby White guilty of first-degree premeditated murder. White received a hard 25 life sentence.

## ANALYSIS

Issue 1: *Did the district court violate White's due process right to present his defense by refusing to allow White's expert to testify, by failing to instruct the jury regarding the defense of mental disease or defect, and by instructing the jury that mental disease or defect was not a defense?*

*Standard of Review*

White claims the district court erred in excluding the expert testimony of Dr. Hutchinson, who would have testified that White suffered from a mental disease or defect, but would not have uttered "the magic words" that the mental disease or defect caused him to lack the mental state required as an element of the offenses charged. White reminds us that "[t]his court has previously recognized that under the state and federal Constitutions a defendant is entitled to present the theory of his or her defense and that the exclusion of evidence that is an *integral* part of that theory violates a defendant's fundamental right to a fair trial." *State v. Evans*, 275 Kan. 95, 102, 62 P.3d 220 (2003). He essentially argues that his only expert witness, psychologist Hutchinson, would have provided evidence integral to his defense of lack of intent caused by mental disease or defect.

The State responds that a defendant's right to present his or her defense is subject to statutory rules and case law interpretation of rules of evidence and procedure, also citing *Evans*, 275 Kan. at

102. Such rules would include our oft-repeated statement that the admission of expert testimony lies within the sound discretion of the trial court, and its decision will not be overturned absent an abuse of such discretion. See *State v. Brice*, 276 Kan. 758, 775, 80 P.3d 1113 (2003).

For several reasons, we hold that our review of this evidentiary-based question is de novo.

First, we are reviewing a statute, K.S.A. 22-3220. The interpretation of a statute is a question of law, and this court's review is unlimited. An appellate court is not bound by the district court's interpretation. *State v. Maass*, 275 Kan. 328, 330, 64 P.3d 382 (2003).

Second, we have observed that even abuse of discretion standards can sometimes more accurately be characterized as questions of law requiring de novo review. See *Kuhn v. Sandoz Pharmaceuticals Corp.*, 270 Kan. 443, 456, 14 P.2d 1170 (2000) (district court failed to correctly apply the *Frye* standard). There we stated, "Questions of law are presented when an appellate court seeks to review the factors and considerations forming a district court's discretionary decision." 270 Kan. at 456. We cited, among other things, *Koon v. United States*, 518 U.S. 81, 100, 135 L. Ed. 2d 392, 116 S. Ct. 2035 (1996), which stated:

"Little turns, however, on whether we label review of this particular question abuse of discretion or de novo, for an abuse-of-discretion standard does not mean a mistake of law is beyond appellate correction. A district court by definition abuses its discretion when it makes an error of law. . . . The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions."

Third, while we have said that the admissibility of evidence is often within the discretion of the district judge, constitutional considerations still prevail. See *Evans*, 275 Kan. at 102.

Illustrative of these concepts is *State v. Humphrey*, 252 Kan. 6, 845 P.2d 592 (1992). There, this court acknowledged that the admissibility of expert testimony lies within the sound discretion of the district court. Nonetheless, we held that the district court had erred in holding under K.S.A. 60-456 that a psychiatrist's testimony was improperly based in part upon hearsay, *i.e.*, the defendant's

statements. In concluding the statements were not hearsay, we held that the psychiatrist should have been allowed to testify about defendant's lack of intent to commit the murder. We concluded the district court had denied defendant his right to present his theory of defense, and reversed and remanded for a new trial. Abuse of discretion was not a basis for the decision.

*Discussion*

Our analysis begins with the statute. K.S.A. 22-3220 provides:

"It is a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the mental state required as an element of the offense charged. Mental disease or defect is not otherwise a defense. The provisions of this section shall be in force and take effect on and after January 1, 1996."

PIK Crim. 3d 54.10 is based upon this statute. As applicable to the offense of first-degree premeditated murder, it states as follows:

"Evidence has been presented that the defendant was afflicted by mental disease or defect at the time of the alleged crime. Such evidence is to be considered only in determining whether the defendant had the state of mind required to commit the crime. You are instructed the defendant is not criminally responsible for his acts if because of mental disease or defect the defendant lacked the premeditation and intent required for first-degree murder."

As this court has often explained, prior to the effective date of this statute — January 1, 1996 — there were two defenses relating to mental disease or defect: insanity and diminished capacity. See *State v. Hedges*, 269 Kan. 895, 900, 8 P.3d 1259 (2000). Criminal insanity was evaluated using the *M'Naghten* test. 269 Kan. at 900. While the defense of diminished capacity was not a substitute for a plea of insanity, it could be used for the limited purpose of negating specific intent where a defendant was sane. 269 Kan. at 901. However, K.S.A. 22-3220 removed any reference to insanity and instead focused on a lack of the mental state required as an element of the offense charged. It now prevents a defendant from raising insanity or diminished capacity as a defense. See *State v. Jorrick*, 269 Kan. 72, 81, 4 P.3d 610 (2000). Accordingly, all capacity defenses, for crimes which took place on or after January 1, 1996, focus on the *mens rea* of the crime. 269 Kan. at 83.

As a result, K.S.A. 22-3220 allows a defendant to present evidence tending to show that he or she lacked the mental state required for the offense charged. *State v. Davis*, 277 Kan. 309, 329-30, 85 P.3d 1164 (2004); *State v. Bethel*, 275 Kan. 456, 474, 66 P.3d 840 (2003).

In *Bethel* and *Jorrick* this court cited with approval Raymond L. Spring's article, *Farewell to Insanity: A Return to Mens Rea*, 66 J.K.B.A. 38 (1997). In discussing procedure under the new law, Professor Spring states:

"Evidence of the defendant's mental state at the time of the alleged crime, through expert or lay testimony, is admissible as before except that the focus will be directly on the issue of the required criminal intent for the specific crime. In a jury trial the court does not give an instruction on insanity but does advise the jury that evidence of the defendant's mental condition is to be considered in determining whether the defendant had the state of mind required for the crime." 66 J.K.B.A. at 45.

With this background, we turn to Dr. Hutchinson's report dated October 12, 2002, discussion between court and counsel, and the court's ruling regarding the report and the doctor's testimony.

Dr. Hutchinson found that White's intelligence was high, but that he suffered from major depression. Her 15-page report stated in relevant part:

"*Mr. White repeatedly denies having any conscious awareness or planning of his actions. While on the one hand driving for two hours without the intervention of reason appears improbable, it does appear to this examiner that it did, in fact, occur in that way.* If Mr. White had done *any* planning, he could have conceived of something more effective, efficient, or safe than the manner in which he conducted the shooting. If he planned to shoot Aaron and escape with the small amount of money he had withdrawn the day before, Mr. White would not have proceeded in full view of dozens of potential witnesses and without any attempt to protect himself from what would be the obvious and predictable aftermath of his actions. It appears that his only objective was to protect [B.A.W.], and nothing else mattered. *His major depression and the intense emotion that occurred after the* [guardianship termination] *hearing prevented Mr. White from competently and rationally weighing the choices and alternatives that might have been available to him despite the grimness of the situation. His emotions strongly overpowered his rational thought about the actions in which he was engaged.*" (Emphasis added.)

Dr. Hutchinson concluded:

"*Mr. White suffered from major depression at the time of the incident and additionally was overcome with emotion in response to the judge's decision that his grandson would be permanently placed with [B.W.] and Aaron Rubianus [sic].* Mr. White believed that [B.A.W.] was in grave danger of physical, emotional and sexual abuse and that [B.A.W.'s] health was also compromised in that setting. Mr. White was unable at that time, and still to this day, to think of any other action that would have granted [B.A.W.] the safety that Mr. White believed was crucial and that he alone was responsible for providing. *Seemingly without thought for the consequences of his intended action, Mr. White shot his son-in-law in a public place and then proceeded to place himself in the hands of authorities.* Mr. White's immaturity, neediness and instability prompted the sense of devastation that resulted from losing custody of [B.A.W.]" (Emphasis added.)

On December 30 the State filed a motion to disqualify Dr. Hutchinson and disallow her expert testimony, arguing that while K.S.A. 22-3220 allows expert testimony on the defense of mental disease or defect, the expert must specifically find that the defendant, because of mental disease or defect, lacked the mental state required as an element of the offense charged. It further argued that Dr. Hutchinson did not offer an opinion on this issue, that her testimony should be disallowed and her report suppressed, and that the court should make a finding that the defense had not presented sufficient evidence to support a legal defense of lack of mental state. White responded on January 3 that it is not necessary, and indeed is improper, for the expert to testify that the defendant was incapable of forming the intent to kill or premeditate due to the mental disease or defect.

During oral arguments on the motion on January 6, 2003, White's attorney stated that when she had asked Dr. Hutchinson if she had an opinion as to whether White lacked the capacity to premeditate or intend to kill because of his mental disease and defect, Dr. Hutchinson stated, "No, I would not. I would not opine that. I cannot opine that. That invades the province of the jury." Counsel continued, "She's going to say 'I can't give you that opinion because it's speculation.' "

The district court later asked White's attorney, "So it's your statement to the Court, then, that Ms. Hutchinson will not be asked nor would she able to testify that the defendant, because of his depression, was not capable of forming intent or premeditation.

She won't be asked that question. And if she were, she would not be able to answer that, as I understand what you've told the Court." White's attorney responded, "She'll be able to answer it. Her answer is, 'I can't tell you that because I would be speculating. I wasn't there. I wasn't in his mind at the time.' "

The next day, after reviewing the report, the statute, and case law, the court held that the defense has to relate the mental disease or defect to the lack of the required mental element required in the crime. It found that although Dr. Hutchinson diagnosed White as suffering from a mental disease or defect, she did not go the next step and say that because of that mental disease or defect, he was not capable at the time of the offense of forming the necessary intent or premeditation. It stated:

"My final conclusion is that if Ms. Hutchinson's report had gone on to say that it was her professional opinion that the defendant, because of his mental disease or defect, was not capable of forming premeditation or the necessary intent, then I would say she's in; she gets to testify. She doesn't say that. And [White's counsel] offered to the Court that, in fact, she's been asked that question and stated that she would not be able to offer that opinion, if asked, because it's her judgment, apparently, that that would invade the province of the jury. I don't see that that would be a problem. I think the problem here is that she can't reach that conclusion. And because she can't reach that conclusion, I don't believe that her testimony should be allowed to support a mental disease or defect instruction under [K.S.A. 22-] 3220 because, as I reiterate, that statute specifically says, 'Mental disease or defect is not otherwise a defense.'

"So I don't think . . . she should be allowed to testify in support of a mental disease or defect defense; nor do I believe she should be entitled to testify in support of lack of premeditation; nor do I believe she should be allowed to present any testimony of mental disease or defect, because, as I read the statute and as I read the cases, unless that testimony is presented to support the defense of mental disease or defect, it's not otherwise admissible.

". . . I want to be clear because I don't want you bringing her in here thinking that although you can't use her for one purpose, you can use her for another. In my judgment, you can't use her for any purpose. So I'm going to disallow her testimony entirely. So that's the Court's ruling on the State's motion in limine. It will be granted."

White's counsel immediately asked to clarify her position for the record, *i.e.,* that Dr. Hutchinson would make the required nexus. She stated in relevant part:

"I think that Marilyn Hutchinson does make that nexus. I think she will make that nexus. She won't say those magic words, 'He lacks the capacity to premeditate or intend to kill,' but she will make the nexus between his actions, ultimately, and the disease that she has diagnosed — the mental disease or defect, and that his actions on that day are consistent with somebody who is laboring under the mental disease or defect, which she's diagnosed. That's what I was trying to say yesterday. *She's not going to say the magic words that because he had a mental disease or defect on that date, he lacked the capacity to premeditate and intend to kill. Rather, what she will say is he had this mental disease or defect and his conduct on that date was consistent with somebody acting under the mental disease or defect. She will also explain before that, obviously, that people who have this mental disease or defect can act irrationally, can lack the ability to premeditate, and can lack the ability to have intent.* Do you see what I'm saying? So I think she will give that nexus." (Emphasis added.)

Counsel next read into the record excerpts from Dr. Hutchinson's report to support her argument the nexus had been made. She then concluded:

"What I would contend, Your Honor, is she is making the nexus between her diagnosis and his ultimate actions. Why she won't answer that ultimate question and why she won't use those magic words is, simply, due to her training; due to the American Board of Psychiatry's opinion on the issue, quite frankly; and due to the fact that she will say, *'Listen, I wasn't there in his mind. I can only give you the opinion about the diagnosis. I can only tell you what this condition makes people do, and it makes people sometimes be able to lack the ability to premeditate and intend to kill. What I can tell you is that he suffered from that condition, and what I can tell you is his actions on this date were consistent with somebody who suffered from that condition.'*

"*If I didn't make that clear yesterday, I apologize, Your Honor, but that's how she would testify, if I put her on the stand.*" (Emphasis added.)

In continuing our analysis, we observe that the adequacy of an expert witness' proffered testimony regarding the mental disease or defect defense identified in K.S.A. 22-3220 and in effect since 1996 has not yet arisen. However, similar issues have arisen regarding the diminished capacity defense, a close relative. As Professor Spring stated in 66 J.K.B.A. 38, 45 (1997):

"Like insanity, diminished capacity disappears as a separate defense [with the appearance of 22-3220]. *Mens rea simply carries diminished capacity to the logical extreme.* With the separate definition of insanity gone, there is no barrier to accepting the idea that *if one's capacity can be so diminished by mental disorder as to destroy the capacity to form a special intent, then it may in some circumstances*

*be so diminished as to destroy capacity to form any criminal intent at all.* That has always been an illogical limitation, thought necessary only to avoid overlap of insanity and diminished capacity."

Similarly, in *State v. Hedges,* 269 Kan. 895, 904, 8 P.3d 1259 (2000), we held that a jury instruction was not clearly erroneous because "the substance of the diminished capacity instruction given and the proper mental disease or defect instruction [under K.S.A. 22-3220] focus on the defendant's ability to form intent. Therefore, the trial court's instruction to the jury was not reversible error."

Diminished capacity case law reveals that expert testimony expressing that a mental problem actually caused the defendant to lack the offense's required mental state need not be stated in such "magic words." *State v. Maggard,* 26 Kan. App. 2d 888, 995 P.2d 916, *rev. denied* 269 Kan. 938 (2000), contains the most parallels. There, defendant appealed his conviction of attempted rape, claiming that the trial court erred in, among other things, refusing him an instruction on diminished capacity. The trial court had stated:

" 'As to the instruction of diminished capacity, the Court, after consideration of the testimony given, does not find that any evidence was given that suggests Mr. Maggard's problems arise above what prior cases have referred to as personality characteristic of poor impulse control. *Also, there has been a lack of testimony that [make] a direct causal connection between Mr. Maggard's capacity and the acts on November 17, 1995* [date of the offense].' " 26 Kan. App. 2d at 890.

Just as Dr. Hutchinson refused to speculate in the instant case, defendant Maggard's expert witness, Dr. Barnett, had testified that "he would be merely speculating if he were to give an opinion as to whether defendant was having an episode of Intermittent Explosive Disorder on [the day of the offense.]" 26 Kan. App. 2d at 891.

After reviewing this and other evidence, the *Maggard* court stated:

"There is no question evidence was presented that defendant was mentally retarded and had Intermittent Explosive Disorder. *A reasonable interpretation of Dr. Barnett's testimony is that defendant has difficulty controlling his impulses to act and when he does act, he does not consider the consequences of his actions.*

"Although the trial court is not required to give an instruction on diminished capacity, even when faced with some evidence of diminished capacity, *defendant's evidence unquestionably raised the issue of his capacity to form the specific intent to commit the crime for which he was charged.* Contrary to the trial court's conclusion, the evidence showed that defendant suffers from more than a mere personality disorder with poor impulse control." (Emphasis added.) 26 Kan. App. 2d at 891.

The *Maggard* court also held that the defendant's strange demeanor on the witness stand, "albeit likely to elicit sympathy, should have been considered by the jury in determining whether he was able to form the intent required in order to be found guilty of the crime of attempted rape." 26 Kan. App. 2d at 892. Accordingly, the Court of Appeals held that the "no sympathy to either party" instruction under PIK Crim. 3d 51.07 should not have been given.

The Court of Appeals thus concluded:

"We find that the effect of the trial court's instruction that the jury was to consider the case without sympathy for either party combined with the trial court's refusal to instruct on diminished capacity *was to remove from the jury's consideration defendant's capacity to form the intent necessary to commit the crime for which he was charged. The combination of these two rulings constitute an abuse of discretion by the trial court.* Defendant's conviction is reversed, and the case is remanded for a new trial." (Emphasis added.) 26 Kan. App. 2d at 892-93.

In short, despite the apparent absence of the "magic words" of direct causation and a refusal to speculate on defendant's having an episode of Intermittent Explosive Disorder on the day of the offense, Maggard's expert witness was allowed to testify. Moreover, since the district court abused its discretion in refusing to instruct on diminished capacity, it is clear that the expert's testimony helped provide evidence sufficient for a jury to consider whether the defendant had the specific intent required to commit the offense.

Although not cited by the *Maggard* court, several decisions of this court support its holding.

In *State v. Jackson,* 238 Kan. 793, 804, 714 P.2d 1368, *cert. denied* 479 U.S. 821 (1986), where this court formally acknowledged the diminished capacity defense, a psychological expert had been allowed to testify that defendant exhibited some symptoms of temporal lobe epilepsy and suffered from brain damage which

had been in existence for a long time and prevented the full development of his intellectual academic skills and higher level activity. However, the expert did not testify as to whether defendant knew right from wrong at the time of the crime.

Similarly, in *State v. Massey,* 242 Kan. 252, 259, 747 P.2d 802 (1987), this court observed that the only evidence that defendant suffered an epileptic seizure at the actual time of the shooting, which we noted would negate *mens rea,* was defendant's own testimony. Nevertheless, because the court held this evidence was corroborated, the failure to give an instruction on unconsciousness was clearly erroneous. 242 Kan. at 261. As apparent corroboration, an expert medical witness had testified that defendant suffered from seizures and merely *"could have had* a seizure from alcohol withdrawal"* at the time of fatally shooting his wife. (Emphasis added.) 242 Kan. at 255.

After the Court of Appeals' *Maggard* decision in 2000, this court decided *State v. Greene,* 272 Kan. 772, 37 P.3d 633 (2001). The primary issue involved allegations of ineffective assistance of counsel, in part due to defense counsel's failure to request a continuance and retain an expert witness to testify about the defendant's lack of intent to commit second-degree murder and aggravated battery. At the subsequent hearing on ineffective assistance, a newly-retained psychiatrist testified for the defendant. We characterized the doctor's testimony as follows:

"Dr. Wisner offered the opinion, as a forensic psychiatrist and expert witness, that Flournoy's taunting Greene with words like 'bitch ass nigger' and saying 'He can suck this dick,' caused the defendant to flash back to his previous subjugated position relative to Flournoy. Dr. Wisner testified that he *would expect the emotional impact* of the vivid reminder of not being able to protect his own [defendant's] integrity to *preclude Greene's forming the intent to kill Flournoy.* He regarded it as *quite plausible* that at that moment Greene lacked the capacity to form the intent to kill and just reacted, lashing out, to hurt someone or somehow protect himself. He concluded: 'I think this is psychiatrically, this is almost a definition of what we've brought to the courts as things like crimes of passion, things like moments of overwhelming impulse, et cetera, all of which really adds up to . . . *reduced ability to form a specific intent or appreciate outcomes and consequences.'* " (Emphasis added.) 272 Kan. at 780.

We held: "Relative to defense counsel's failure to request time to adequately prepare the defense, we note that Dr. Wisner's tes-

timony would have supplied evidence of defendant's mental state being altered in reaction to Flournoy's taunting words." 272 Kan. at 781. We concluded: "Because the testimony of Dr. Wisner could exonerate defendant of intentional second-degree murder, we are convinced that there is a reasonable probability that the outcome would have been different." 272 Kan. at 783. Defense counsel's failure to supply this expert for trial demonstrated his assistance was deficient and was a basis for reversing and remanding for new trial.

Furthermore, this court has held that "magic words" or "particular words of art" are not necessary in an expert's medical opinion so long as the appropriate standard is met. See *Sharples v. Roberts,* 249 Kan. 286, 296, 816 P.2d 390 (1991); *Nunez v. Wilson,* 211 Kan. 443, Syl. ¶ 1, 507 P.2d 329 (1973).

Dr. Hutchinson's profferred testimony reveals she would have testified that White had ·a mental disease or defect, that people with this disease or defect can lack the ability to premeditate and to form intent, and that his conduct on the date of the shooting was consistent with somebody acting under that disease or defect. Based upon this proffer and the cited Kansas case law, we disagree with the court's ruling that her testimony was inadmissible under K.S.A. 22-3220. Moreover, under *State v. Humphrey,* 252 Kan. 6, 14, 845 P.2d 592 (1992), and *State v. Evans,* 275 Kan. 95, 102, 62 P.3d 220 (2003), we hold that her testimony was an integral part of White's theory of defense and its exclusion violated his fundamental right to a fair trial.

Given this holding, it follows that the resultant refusal to give an instruction on mental disease or defect, though none was requested, was also error. See *State v. Williams,* 277 Kan. 338, 356, 85 P.3d 697 (2004) (In a criminal action, a trial court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence.); *Massey,* 242 Kan. at 256-61; *Maggard,* 26 Kan. App. 2d at 893. White's complaint about the district court's response to the jury's question during deliberations concerning consideration of White's emotional and mental well-being is therefore moot.

Issue 2: *Does K.S.A. 22-3220 unconstitutionally abrogate the insanity defense?*

White next argues that K.S.A. 22-3220 violates his due process rights under the United States and Kansas Constitutions by abrogating the insanity defense. We rejected this identical argument in *State v. Bethel,* 275 Kan. 456, 473, 66 P.3d 840 (2003), and affirmed *Bethel's* holding after an identical attack in *State v. Davis,* 277 Kan. 309, 85 P.3d 1164 (2004). White cites no post-*Bethel* authority that would alter this court's analysis of that issue. We do not retreat from that position now.

White also claims the State committed misconduct and the district court committed additional error. These claims could now be disregarded because of our reversal and remand on previously noted grounds. We address them below, however, to supply guidance because they could arise in a retrial. See *State v. Kunellis,* 276 Kan. 461, 476, 78 P.3d 776 (2003).

Issue 3: *Did the prosecutor's misstatements of the law in closing argument deny White a fair trial?*

White next argues that the prosecutor misstated the law of voluntary manslaughter in her closing argument, denying him a fair trial. Although no objection was lodged, a misstatement of controlling law denies a criminal defendant his or her right to due process, and this court must review such an alleged error on appeal despite the absence of an objection at trial. *State v. Morton,* 277 Kan. 575, 583-84, 86 P.3d 535 (2004).

Since we are reversing and remanding because of error on issue one, however, we need not determine whether error on issue three actually denied White a fair trial. We do observe that in the rebuttal portion of the prosecutor's closing argument, she misstated the law regarding voluntary manslaughter, suggesting it contained no requirement of intent. The district court interrupted her twice and had counsel approach. After the last bench conference, the court then correctly advised the jury of the controlling law and cured the problem:

"Members of the Jury, the Court wishes to, simply, remind you of the jury instructions that I earlier gave you and to read those instructions closely. And

when you do, you will see that premeditated first-degree murder, murder in the second-degree, and voluntary manslaughter all require a finding on your part that the killing was intentional. You may proceed."

As a result, although repetition of the prosecutorial error at the new trial is possible, it is highly unlikely.

Issue 4: *Did the district court err by failing to instruct the jury on heat of passion voluntary manslaughter?*

White requested an instruction on voluntary manslaughter based on two theories: (1) upon a sudden quarrel or in the heat of passion and (2) an unreasonable but honest belief that circumstances existed justifying deadly force in defense of a person. See K.S.A. 21-3403(a), (b). The district court refused any instruction based upon the former, and White objected.

This court recently discussed the denial of this same instruction in *State v. Horn*, 278 Kan. 24, 39-41, 91 P.3d 517 (2004). The detailed analysis by the *Horn* court need not be repeated here. Greatly summarized, we held that the instruction on voluntary manslaughter was required if there were some evidence of sudden quarrel or heat of passion as a result of severe provocation which, when viewed in the light most favorable to the defendant, would reasonably justify a conviction on that lesser included offense.

White points to evidence that he was overcome with emotion; that without an opportunity to be heard, he lost custody of his grandson to a person he viewed as abusive; that he walked into Wal-Mart during daytime hours and, in front of several witnesses, shot his son-in-law, walked out of the Wal-Mart, and stood in the parking lot awaiting arrest. However, this is not evidence of an adequate provocation sufficient to instruct on voluntary manslaughter on the basis of heat of passion or sudden quarrel. See also *State v. Follin*, 263 Kan. 28, 38, 947 P.2d 8 (1997) (act of violence separated from the provocation by sufficient cooling time is not the product of heat of passion).

Unless this evidence changes at retrial, no instruction on voluntary manslaughter on the basis of heat of passion or sudden quarrel need be given.

Issue 5: *Did the district court's instruction that the jury could only consider voluntary manslaughter if the jury did not agree on first-degree murder violate due process?*

White next claims that the jury was given conflicting instructions on whether to consider the lesser offenses of second-degree murder and voluntary manslaughter, which he claims therefore violates his due process rights. Among other things, he complains that the jury may have understood that it must first consider whether White was guilty of first-degree premeditated murder before considering any lesser included offenses.

White points out that the jury was first instructed on the elements of first-degree murder. Regarding second-degree murder, Instruction No. 6 of which he complains stated in relevant part: "If you do not agree that the defendant is guilty of murder in the first-degree, you should then consider the lesser included offense of murder in the second-degree." It then provided the elements of the offense. Instruction No. 7 of which he complains concerned voluntary manslaughter and stated in relevant part: "In determining whether the defendant is guilty of murder in the second-degree, you should also consider the lesser offense of voluntary manslaughter . . . an intentional killing done upon an unreasonable but honest belief . . . ."

White did not object to these instructions. More important, White's argument was rejected in *State v. Roberson*, 272 Kan. 1143, 38 P.3d 715, *cert. denied* 537 U.S. 829 (2002), where the court reviewed the same instructions used here: PIK Crim. 3d 56.01, 56.04(b, d); 56.03; and 56.05. One year later this court confirmed its rationale in *State v. Davis*, 275 Kan. 107, 61 P.3d 701 (2003). The detailed analysis by the *Roberson* court, which appears at 272 Kan. at 1153-1155, and which was partially repeated by the *Davis* court at 275 Kan. at 126-127, need not be repeated here.

There was no error.

Issue 6: *Did cumulative error substantially prejudice White and deny him a fair trial?*

Lastly, White complains of cumulative error. This issue is moot

in light of our reversal and remand for new trial because of error on issue one.

Reversed and remanded.