NOT DESIGNATED FOR PUBLICATION

No. 113,705

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
Appellee,

v.

BROOKE DANIELLE DINKEL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Saline District Court; PATRICK H. THOMPSON, judge. Opinion filed March 23, 2018.
Affirmed.

*Richard Ney*, of Ney, Adams & Miller, of Wichita, for appellant.

*Amy E. Norton*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MCANANY, P.J., GARDNER, J., and TIMOTHY L. DUPREE, District Judge, assigned.

GARDNER, J.: Brooke Danielle Dinkel, a middle school counselor, was found guilty of two counts of rape of a child under age 14—one of the students at the school where Dinkel worked. Dinkel claims that counsel's performance and the trial court's rulings hindered her ability to put on two theories of defense: that she was actually the victim because the 13-year-old student raped her; and that she suffered from a mental disease or defect that prevented her from forming "the requisite intent" for the crimes. But the jury was not instructed on any theory of defense, and the statute establishing the crime of child rape committed by Dinkel does not require intent. Because Dinkel has failed to show any error, we affirm.

1

*Factual and procedural background*

Dinkel was hired as a counselor at Smoky Valley Middle School in Lindsborg, Kansas, for the 2012-13 school year. K.H. was an eighth grader there. His aunt was a friend of Dinkel's family and asked Dinkel to check on K.H. periodically because he had had difficulties at his previous school. K.H. was large for his age—6'2" and about 170 pounds.

Dinkel began counseling K.H. and frequently initiated contact with him at school. The school principal and teachers noticed Dinkel's increasing attention to K.H. Employees at Smoky Valley testified about the constant contact between K.H. and Dinkel. Several teachers observed a marked change in K.H.'s behavior and academic performance beginning in September and October 2012. Dinkel would routinely, and unnecessarily, ask teachers to excuse K.H. from class and send him to her office. She also wanted him to be in a school boys' club she created, despite objections from the core group of K.H.'s teachers.

While K.H. was in detention, Dinkel would sneak food and drinks in to him, and often pulled him out of detention in violation of school policy. Dinkel would approach K.H. while he was in class and speak to him or slip him notes. A paraprofessional saw Dinkel and K.H. leaving school together on multiple occasions. Dinkel once asked another student to text K.H. for her to find out why he was not at school that day. At one point, K.H. told Dinkel he needed money and she hired him to work at her home removing wallpaper and painting. These visits became social—Dinkel and K.H. played video games on the Xbox in her home and went out to buy meals.

Dinkel was admonished by more than one school faculty member that she appeared to be crossing the line between teacher and student by giving K.H. so much extra attention. One staff member said that Dinkel appeared fixated on K.H. The

2

principal, when looking for K.H., found him in Dinkel's office with the door locked and paper covering the window. He told Dinkel not to have K.H. in her office with the door locked and not to pull K.H. from class without his permission. Nonetheless, Dinkel continued to pull K.H. from class after this warning and enlisted the help of a new teacher who was unaware of the warnings Dinkel had been given about contacting K.H. On three occasions when faculty went looking for K.H. they found him in Dinkel's office with the door locked and paper covering her office windows.

Despite all of the contact staff members had with Dinkel in regard to K.H., none of these faculty members ever observed Dinkel express any fear of K.H., nor did Dinkel mention to anyone at the school that she was afraid of him.

In November or December 2012, the relationship turned sexual. Dinkel testified that the first time she and K.H. had sexual intercourse was on December 26, 2012, and that K.H. raped her. But she had bragged to friends about her sexual relationship with her new young boyfriend, giving only his first name and saying he was 19 years old. Dinkel told Kelsi Martin that she bought things for her boyfriend, played games on the Xbox with him, and went paintballing with him. Dinkel showed her friend, Misty Miller, several pictures of Dinkel and K.H. together, and Dinkel identified K.H. as K., her boyfriend. In some of the pictures Miller saw, Dinkel and K.H. were hugging and kissing. In another picture, Dinkel was wearing K.H.'s hat. Dinkel volunteered to Miller graphic details about sexual encounters between herself and K.H., saying the sex was great. Miller also testified that Dinkel called or texted K. very frequently, and that Dinkel often expressed frustration when he did not respond to her calls or messages. Dinkel told Miller that she purchased things for K. because she liked to do things for him. She told Miller that K. had been to her house, had been swimming with her children, and that the two had spent the night in a hotel room Dinkel had rented.

In February 2013, Dinkel texted another friend the following:

3

"Well I've been with a really young guy . . . . He is the absolute best sex ever . . . . [I know] it won't be long term but I love him and the sex is tooooooo good to let him go. So he just turned 19—yes [I know] that's horrible . . . he looks so young but he is defiantly [sic] a man."

On February 25, 2013, Dinkel again told a group of friends at a bar about her sexual exploits with her young boyfriend, K. She then used one friend's cell phone to text K.H. saying, "this is ur gf bitch—love u."

Dinkel told her friends she bought K.H. gifts, but she testified that over time, he began demanding that she buy him things and give him money. She bought him clothing, an iPad, and Airsoft games, and gave him cash and a credit card. Upon finding out about the credit card, K.H.'s aunt warned K.H. to stay away from Dinkel, and K.H.'s mother and aunt told Dinkel that the relationship appeared inappropriate and that she should stay away from him. K.H.'s aunt told Dinkel to stay away from K.H. or she would pursue action against Dinkel.

On March 9, 2013, Jayson Dinkel was still married to and living with Dinkel at their home, although she had filed for divorce. That day, Jayson found a note under the couch at the Dinkel home. The note was written by Dinkel, was addressed to someone with the same first name as K.H., and said, among other things, "the more I hold you in my arms, the more I fall in love with you." The next day Daylight Saving Time began, but not all of the clocks in the house had been moved forward yet. Jayson returned home at his normal time, 2 p.m., and found K.H. sitting on the couch with his pants and underwear pulled down to his ankles. A few moments later, Dinkel came downstairs and asked Jayson why he was home early. Dinkel did not express any fear of K.H. to Jayson at the time, and later laughed with another friend about how Jayson had caught her and her boyfriend, K.

4

The full nature of their relationship came to light in March of 2013. On March 26, 2013, Dinkel surreptitiously delivered pizza and pop to K.H. while he was in the in-school suspension (ISS) room. When questioned by the ISS supervisor, K.H. refused to tell her where he got the food, so the supervisor called the principal. K.H. refused to tell the principal where the food came from. When the principal questioned K.H. about the pizza, Dinkel was right outside the door, as if trying to listen. After K.H. became belligerent and made a threatening move, the principal expelled him. When K.H.'s aunt picked him up from school that evening, she told the principal her concerns about K.H.'s relationship with Dinkel.

The next day, Dinkel called in sick and did not go to work. K.H., accompanied by his father and aunt, met with school officials and confirmed that he and Dinkel had engaged in sexual acts. Dinkel, aware of the meeting, texted K.H. and told him that their families were worried about the two running away together. She also told him that the school would try to turn them against each other and asked K.H. to contact her after the meeting because she was "freaking out." She also told him "[I know you] love me and aren't going to say anything."

On the same day, Dinkel texted her friend Misty Miller and told her not to be sad and that she did not want her friends and family to be embarrassed. The next day, Dinkel texted Miller again and said that Dinkel had gotten herself into some trouble but thought it would blow over because the police had not contacted her yet. Miller, who already suspected that K.H. was a student, responded to Dinkel that she believed she knew what Dinkel was referring to and asked if it was about K. Dinkel responded by asking how Miller knew about K. and saying that it was way worse that what Miller was thinking. At no point did Dinkel mention to her friends that K.H. had raped her or that she was afraid of him.

5

Police investigators searched Dinkel's home and removed her bed comforter and two used condoms. Analysis of the comforter showed two areas with semen stains that were consistent with the known DNA profiles of K.H. and Dinkel. The condoms did not contain seminal fluid, but one contained skin cells consistent with the known DNA profiles of K.H. and Dinkel, and one contained DNA consistent with Dinkel's DNA profile. Police also located an open box of condoms in the master bathroom, a jar of lubricant, and an Xbox game with both K.H.'s and Dinkel's profile information on it. K.H. was able to accurately describe to police where the condoms and lubricant would be found in the house. Jayson Dinkel confirmed to police that he and Dinkel did not use condoms during intercourse.

Dinkel was ultimately charged with 10 counts of rape of a child under the age of 14 and 10 counts of aggravated criminal sodomy. The jury found Dinkel guilty of two counts of rape of a child under age 14 but acquitted Dinkel of the remaining 8 counts of rape, as well as all 10 aggravated sodomy charges. Dinkel was granted a significant durational departure from a Jessica's Law sentence. Instead of being sentenced to 25 years to life imprisonment, with no possibility of parole for 25 years, see K.S.A. 21-6627(d)(1), Dinkel was sentenced to 165 months—just under 14 years—on each count and the sentences ran concurrently. Dinkel then appealed.

*The ineffective assistance of counsel hearing*

Appellate counsel then claimed that Dinkel's trial counsel, Roger Struble, was constitutionally ineffective and moved for remand for a *Van Cleave* hearing. See *State v. Van Cleave*, 239 Kan. 117, 716 P.2d 580 (1986). On remand, the district court judge who had conducted the trial held an extensive hearing on multiple claims of ineffectiveness. The district court issued a written memorandum and order finding trial counsel effective. The only instance of deficient performance the court found was in counsel's failure to pursue the introduction of certain impeachment evidence against K.H., consisting of texts

6

or other communications showing that K.H. was sexually experienced and aggressive, and showing that he had sent the Facebook message admitting he raped Dinkel the first time. Despite this deficient performance, the district court found that the evidence was likely inadmissible and no prejudice could be found. Thus, the district court rejected all of Dinkel's claims.

Dinkel now claims that counsel's performance and the trial court's rulings hindered her ability to put on her theories of defense that K.H. raped her and that she suffered from a "mental disease or defect," both of which prevented her from forming "the requisite intent" for the crimes.

*Did the District Court Err in Limiting the Scope of Testimony from an Expert Psychologist?*

We first address Dinkel's contention that the district court erred in limiting the scope of testimony from her expert psychologist, Dr. Marilyn Hutchinson.

*The psychologist's report and testimony*

Prior to trial, Dinkel filed a notice of intent to allege a mental disease or defect defense, relying on a psychological evaluation and report conducted by Hutchinson. The State objected that Hutchinson's report did not state that Dinkel had a mental disease or defect that impacted her ability to form the requisite mental intent. Instead, Hutchinson's report stated that Dinkel understood that "a sexual relationship with a fourteen year old boy is improper." The State argued that the proffered testimony was nothing more than Hutchinson's opinion that Dinkel had been raped and that such opinion testimony was improper. The district court ruled Hutchinson's testimony was inadmissible because her opinion failed to conclude that Dinkel was unable to form the requisite mental state as a result of a mental disease or defect.

7

Dinkel moved the court to reconsider its exclusion of Hutchinson's testimony. The district court recognized that many witnesses had testified that Dinkel had given K.H. food and gifts, then it altered its previous ruling by allowing trial counsel to introduce a portion of Hutchinson's testimony to explain Dinkel's behavior. Hutchinson testified that Dinkel had been sexually assaulted as a child, was evidencing symptoms of trauma including post-traumatic stress disorder (PTSD), and that Dinkel thought she was the only person who really understood K.H. and could help him. Hutchinson further testified that Dinkel had a lifelong strategy of avoidance. Due to the sexual abuse that occurred during her childhood, Dinkel shut down emotionally and pretended the problem was not there. Hutchinson testified that Dinkel told her that after the initial sexual assault on December 26th, K.H. and Dinkel had a second forced encounter later that same week, followed by sexual contact in February and for two weeks in March.

Hutchinson was not allowed to testify that at the initial sexual encounter on December 26, 2012, K.H. raped Dinkel and did not use the term "rape trauma syndrome" to explain Dinkel's subsequent actions toward him, including continuing their sexual relationship. The district court ruled that Hutchinson could not testify that Dinkel's claim of being raped was credible.

*Standard of Review*

Dinkel casts her argument as a constitutional one, stating that the due process protections of the Kansas Constitution and the Fourteenth Amendment to the United States Constitution entitle a criminal defendant to present the theory of his or her defense. We apply a de novo standard in reviewing whether a particular ruling on the admissibility of evidence violated a defendant's constitutional right to a fair trial. *State v. White*, 279 Kan. 326, 332-33, 109 P.3d 1199 (2005). In such cases, we apply the constitutional harmless error standard: whether the party benefiting from the error proves beyond a

8

reasonable doubt that the error did would not or did not affect the outcome of the trial in light of the entire record. *State v. Santos-Vega*, 299 Kan. 11, 24, 321 P.3d 1 (2014).

*Discussion*

Dinkel argues that the district court's limitations on Hutchinson's testimony eliminated an integral part of her mental disease or defect defense, and that the district court should have instructed on that defense even though that instruction was never requested. She relies on our Supreme Court's statement that "exclusion of evidence that is an integral part of that [defense] theory violates a defendant's fundamental right to a fair trial." *White*, 279 Kan. at 331.

The district court initially struck Hutchinson's testimony because her report did not state that Dinkel suffered from a mental disease or defect that prevented her from forming the intent to commit the crimes with which she was charged. When the court revisited that issue midtrial, it permitted Hutchinson to testify about Dinkel's PTSD diagnosis, but precluded testimony on other issues. Dinkel contends on appeal that she suffered from rape trauma syndrome, battered woman's syndrome, and Stockholm syndrome and that Hutchinson would have testified at trial that Dinkel suffered from those mental diseases or defects at the time of the alleged offenses. However, none of those diagnoses were in the report Hutchinson prepared for trial; therefore, they were not excluded by the district court's ruling.

This defense of mental disease or defect was the primary defense at trial. The statute governing this defense at the time of the crimes of child rape were committed provided:

> "It shall be a defense to a prosecution under any statute that the defendant, as a
> result of mental disease or defect, lacked the culpable mental state required as an element

9

of the crime charged. Mental disease or defect is not otherwise a defense." K.S.A. 2012 Supp. 21-5209.

Thus, merely having a mental disease or defect is not a defense. Instead, our statute requires proof that a mental disease or defect causes the defendant to lack the culpable mental state required as an element of the offense charged.

Dinkel contends that Hutchinson would have testified that Dinkel lacked the mental state required for the offense charged. Dinkel relies upon *White*, a 2005 first-degree premeditated murder case where our Supreme Court reversed the defendant's conviction after finding that testimony concerning the defendant's ability to form premeditation was admissible under K.S.A. 22-3220. 279 Kan. at 341. That case is inapposite for two reasons. First, the statute relied on was repealed in 2011 and replaced with K.S.A. 21-5202(a), which requires a showing that a defendant's mental disease or defect could negate his or her "culpable mental state," the definition of which excludes premeditation. More importantly, as discussed below, the statute defining child rape does not include a culpable mental state.

*The relevant statute*

K.S.A. 2012 Supp. 21-5503(a)(3), rape of a child, does not require *any* mental state as an element of that offense, unlike every other subsection of the statutory definition of rape, which requires "knowing" action by the defendant:

"(a) Rape is:
    "(1) *Knowingly* engaging in sexual intercourse with a victim who does not consent to the sexual intercourse under any of the following circumstances:
        (A) When the victim is overcome by force or fear; or
        (B) the victim is unconscious or physically powerless;

10

"(2) *Knowingly* engaging in sexual intercourse with a victim when the victim is incapable of giving consent . . . ;

"(3) sexual intercourse with a child who is under 14 years of age;

"(4) sexual intercourse with a victim when the victim's consent was obtained through a *knowing* misrepresentation made by the offender that the sexual intercourse was a medically or therapeutically necessary procedure; or

"(5) sexual intercourse with a victim when the victim's consent was obtained through a *knowing* misrepresentation made by the offender that the sexual intercourse was a legally required procedure within the scope of the offender's authority." (Emphasis added.) K.S.A. 2012 Supp. 21-5503.

The absence of any culpable mental state for the crime of child rape in 21-5503(a)(3) is glaring.

The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010). The legislature placed the mental state requirements of "knowing" and "knowingly" into each subsection of K.S.A. 2012 Supp. 21-5503 except (a)(3), unambiguously demonstrating that it knew how to specify a mental state element and that it intended to require no mental state for child rape but instead to impose absolute liability for that crime. Any policy argument as to what the law should be is for the legislature, not for this court. See *Sierra Club v. Mosier*, 305 Kan. 1090, 1112, 391 P.3d 667 (2017) ("Under the separation of powers doctrine, determination of the appropriate policy must be left to the legislative and executive branches of Kansas government."). We cannot add an intent element to the statute defining the crime of child rape, as Dinkel invites us to do.

With the recodification of the Kansas Criminal Code, the general rule is that a culpable mental state is an essential element of every crime. K.S.A. 2012 Supp. 21-5202(a). But a culpable mental state is not required if the definition of a crime dispenses

11

with any mental element. K.S.A. 2012 Supp. 21-5202(d); *State v. Hanks*, No. 114,640, 2016 WL 4585620, at 2 (Kan. App. 2016) (unpublished opinion). Such is the case here. Likewise, under K.S.A. 2012 Supp. 21-5203(b), no culpable mental state is required if the crime is a felony and "the statute defining the crime clearly indicates a legislative purpose to impose absolute liability for the conduct described." The crime of child rape meets those two requirements. It is undisputed that this crime is a felony, and we have previously found that the statute defining the crime of child rape clearly indicates a legislative purpose to impose absolute liability for the conduct described. *State v. Prieto-Hernandez*, No. 109,696, 2014 WL 3731921, at *17-18 (Kan. App. 2014) (unpublished opinion).

In *Prieto-Hernandez*, the defendant argued that the offense of child rape required a jury instruction on intent. He argued that without such a requirement an individual could be found guilty of rape due to accidental conduct. Dinkel makes the same argument here, but extends it to a scenario in which the adult is forcibly raped by the child.

In rejecting the claimed error, the panel determined that an intent instruction would not have been legally appropriate because lack of intent could not be a defense to the crime of child rape. After reviewing the statutory definitions of rape in K.S.A. 21-5503 which we have set forth above, all of which require "knowing" acts except for child rape, the panel found:

> "The absence of any scienter requirement in K.S.A. 2013 Supp. 21-5503(a)(3) reflects a legislative intent to impose absolute liability for the offense of rape of a child under 14 years of age.
>
> "Although not cited by either party, K.S.A. 2013 Supp. 21-5204(b) provides that proof of a culpable mental state does not require proof 'that the accused had knowledge of the age of a minor, even though age is a material element of the crime with which the accused is charged.' In other words, the State is not required to prove that the accused knew that the victim was under 14 years of age in order for the accused to be found guilty

12

of child rape. K.S.A. 2013 Supp. 21-5204(b) provides further evidence that the legislature intended the offense of child rape to be an absolute liability crime that does not require a culpable mental state on the part of the offender.

"We conclude that the statute defining child rape in violation of K.S.A. 2013 Supp. 21-5503(a)(3) clearly indicates a legislative purpose to impose absolute liability for the conduct described. See K.S.A. 2013 Supp. 21-5204(b). Thus, Prieto-Hernandez' requested instruction on culpable mental state was not legally appropriate, and the district court did not err in failing to give the instruction." *Prieto-Hernandez*, 2014 WL 3731921, at *18.

We find *Prieto-Hernandez* to be well-reasoned, in light of the unambiguous language of the statute.

"An absolute liability offense, unlike most other crimes, does not require any criminal intent. The only proof required to convict an individual of an absolute liability offense is that the individual engaged in the prohibited conduct." *State v. Hopper*, 260 Kan. 66, 70, 917 P.2d 872 (1996). Dinkel admitted the prohibited conduct here.

"Q. How many times do you claim that [K.H.] sexually assaulted you?

"A. Once.

"Q. So there was one act of sexual intercourse; is that correct?

"A. You asked me how many times he sexually assaulted me, and I said once.

"Q. Once. Were there times that you're now saying you consented?

"A. Can you re-state the whole question so I—I understand it.

"Q. Were there times that you and [K.H.] had sexual encounters that you consented to?

"A. Um, whenever he would demand, if he—if he wanted to go to Walmart, if he wanted to, um, things from me, like in that, sexual things, it was dominated by him.

Throughout the trial, Dinkel never contested that she had sexual intercourse with K.H. more than once. In fact, Hutchinson testified that Dinkel had told her Dinkel had sex with

K.H. on multiple occasions. Dinkel's theory of defense was, instead, that she had done so because K.H. had raped her the first time and she did whatever he asked thereafter.

Dinkel contends that the jury convicted her of raping K.H. on December 26, 2012, the date she contends K.H. actually raped her. But the facts do not support this theory. The State is allowed to allege approximate time frames in prosecutions for sex offenses committed against children. See *State v. Rojas-Marceleno*, 295 Kan. 525, Syl. ¶ 6, 285 P.3d 361 (2012). The State did so here, alleging that nine of the ten counts of child rape occurred "on or between the 23rd day of November, 2012, and the 19th day of March, 2013." None of the child rape counts specifically alleged the act occurred on December 26, 2012, and the jury convicted Dinkel of two counts of rape that were not date specific. Thus, Dinkel's argument that she was convicted of a rape on December 26, 2012, is factually speculative. And Dinkel's claim that proof she was raped on that date "would have negated the essential element of intent" is legally erroneous, as detailed above.

Both parties tried their theories to the jury. Dinkel testified that K.H. raped her the first time, and introduced the Facebook message and other evidence in support of that theory. Cross-examination of K.H. showed him to be an aggressive, manipulative blackmailer of Dinkel. K.H. denied ever raping Dinkel, denied sending the Facebook message, and painted Dinkel as having initiated the sexual relationship. The jury made its decision, which favored Dinkel on 18 out of 20 counts.

Dinkel contends that if the statute contains no culpable mental state, an unwilling adult who is forcibly raped by a child could be found guilty of this crime. But this argument is hypothetical and does not apply to the facts of this case. We cannot conceive of a situation in which the lack of an intent element in this statute could lead to the prosecution of a victim rather than of the perpetrator of the crime.

14

*The jury instructions*

Despite the plain language of the statute, and for a reason unknown to us, the jury instructions for child rape required the jury to find that Dinkel "knowingly" engaged in sexual intercourse with the child, thus interjecting into the jury deliberations a culpable mental state not required by statute. Neither party complains on appeal of this error, which was in Dinkel's favor. Dinkel did not claim below nor does she claim now that any given jury instruction was erroneous.

The jury convicted Dinkel of counts 1 and 2 of child rape. As to those counts, the jury was instructed identically, as follows:

"The defendant is charged in Count [1] with rape. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

1. The defendant knowingly engaged in sexual intercourse with K.H., . . . who was less than 14 years old when the sexual intercourse occurred. The State need not prove the defendant knew the child's age.

2. The defendant was 18 years of age or older when the sexual intercourse occurred; and

3. This act occurred on or between the 23rd day of November, 2012, and the 19th day of March, 2013, in Saline County, Kansas."

The other counts of rape were identical except for Count 10, which differed only by alleging the act occurred on or about March 20, 2013.

A separate instruction defined "knowingly" consistent with the statutory definition in K.S.A. 2012 Supp. 21-5202(i). "In Counts 1-10, the State must prove that the defendant engaged in sexual intercourse with K.H. aka K.R. knowingly. A defendant acts

15

knowingly when the defendant is aware of the nature of her conduct that the State complains about."

Hutchinson did not opine that Dinkel was unable to form the culpable mental state of "knowingly." To the contrary, Hutchinson's psychological evaluation report—in a portion not presented at trial—stated that Dinkel knew that sex with a 14 year old is wrong: "There is no question that a sexual relationship between an adult and a 14-year-old boy is improper. Miss Dinkel knew and knows that." Dinkel concedes as much in her brief. The district court properly concluded that this doomed Dinkel's defense theory.

Hutchinson's opinions, if any, that Dinkel suffered from rape trauma syndrome, battered woman's syndrome, and Stockholm syndrome, were not in her original report and were not presented until the Van Cleave and sentencing hearings. Thus, their absence from the trial was not due to any ruling by the district court. No sua sponte jury instruction on a mental disease or defect defense was warranted.

*Did the Trial Court Violate Dinkel's Fourteenth Amendment Right to Due Process of Law by Permitting Londono's Testimony?*

We next address Dinkel's contention that a rebuttal witness falsely testified that Dinkel fabricated an August 20 Facebook message from K.H. to her in which K.H. admitted to acts that may constitute rape. For purposes of convenience we refer to the Facebook message as K.H.'s admission that he raped Dinkel.

*The Facebook message*

During trial, in support of Dinkel's theory that K.H. had raped her, Dinkel's counsel introduced two printed pages purporting to be copies of a screenshot Dinkel had taken of a Facebook message K.H. had sent her on August 20, 2013, after Dinkel had

16

been charged in this case, in which K.H. admitted having raped Dinkel. The pages were not identical. The actual message had been deleted from Dinkel's account. On direct examination, Dinkel translated the abbreviations contained in the Facebook message from K.H. to Dinkel into the following words:

> "What the f---? Why won't you talk to me? You better not tell anyone or I will say you messaged me first. You know they believe anything I say. I didn't tell truth 'cause I didn't want to get into trouble, I guess. I know the first time you said no and stop, but girls just say that, and I know you wanted it. You know that you liked it and I know I said if we kept fu---ing and money I said I promise not to tell but sorry and you know you started loving it more than me. You loved me and I loved you but whatever. I guess you don't care anymore. It doesn't matter if you didn't want to first, cause I'm 14 and you're 32 so it's still your fault. Tell anyone and everyone will know we f---ed. I'll say you messaged me and I deleted it dumbass. Just come here cause I need more money. No one will find out it's the least you can do. Call me or I'll say that 800 I took from you that you gave it to me to change my story and I'll never talk to you again and you'll go to jail forever. Stop being a bitch and call me."

When the defense cross-examined K.H., he denied having sent the Facebook message and denied having raped Dinkel. On cross-examination, the State attempted to secure an admission from Dinkel that the message was fabricated. The State then called Officer Carlos Londono as a rebuttal witness to explain possible sources of the discrepancies in the appearance of the screenshots and to testify that it was possible to create fake Facebook accounts and messages. Before Londono took the stand, Dinkel objected, arguing that Londono would be testifying as an expert but had not been endorsed previously as an expert witness, nor had the defense received his expert report. The State countered that Londono was not testifying as an expert and that endorsement of rebuttal witnesses was not required. The district court agreed and allowed the testimony.

Londono testified that it is not difficult to create a Facebook account in another person's name and he identified suspicious indicia he saw in the admitted exhibits. He

17

also testified that it is possible to screenshot a message from one account and cut-and-paste it with other messages. In closing argument, the State argued that Dinkel had done so here, making it look as though K.H. had sent the Facebook message to Dinkel when he actually had not.

*Dinkel's assertions that Londono's testimony was improper rebuttal or evidence of a prior crime*

We review a trial court's decision to admit rebuttal evidence for abuse of discretion, and such a ruling will not be grounds for reversal unless there is abuse of that discretion that "unduly prejudices the defendant." *State v. Cosby*, 285 Kan. 230, 250, 169 P.3d 1128 (2007). Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, (2) is based on an error of law, or (3) is based on an error of fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011). Dinkel does not expressly argue that the court abused its discretion, but argues legal error which could constitute such an abuse.

First, Dinkel contends that the State improperly elicited the testimony that prompted Londono's rebuttal testimony. "A party cannot open the door for itself to present the inadmissible evidence." *State v. McClanahan*, 259 Kan. 86, 94, 910 P.2d 193 (1996). But here, after the State put on its case, Dinkel took the stand, introduced the Facebook message exhibits, and testified about them during her direct examination, presenting those exhibits as authentic. The State was unable to secure Dinkel's admission on cross-examination that the exhibits were not authentic, and was thus permitted to challenge that issue by rebuttal testimony. This is typical rebuttal testimony, not prohibited testimony allowed only because the opposing side opened the door.

Next, Dinkel argues that Londono's testimony that she fabricated the Facebook messages shows she committed a crime, yet the State failed to satisfy the requirements of K.S.A. 2013 Supp. 60-455, which governs the admission of prior crimes. But the State

18

did not attempt to introduce the evidence under K.S.A. 2013 Supp. 60-455, the trial court did not admit the evidence under K.S.A. 2013 Supp. 60-455, and Dinkel fails to show what prior crime she committed. The State never alleged any crime below and Dinkel specifies none on appeal. Unlike in *State v. Everett*, 296 Kan. 1039, 297 P.3d 292 (2013), we need not engage in a 60-455 analysis here.

*Dinkel's constitutional challenge that Londono's testimony was false*

Dinkel contends that Londono testified that Dinkel fabricated the August 20 Facebook message from K.H. in which he admitted he raped her. Dinkel then claims Londono's testimony is "false evidence" because her expert at the *Van Cleave* hearing opined that the exhibits examined by Londono were authentic, meaning the Facebook message and its admission of rape had actually been sent by K.H.

Dinkel casts her attack on the admission of Londono's testimony as a Fourteenth Amendment due process violation. Framing the issue as a constitutional one triggers the de novo standard of review, in which we accord no deference to the district court's legal conclusions. We do not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016).

A conviction based upon false evidence is a due process violation requiring reversal. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). The Kansas Supreme Court has interpreted *Napue* by stating: "A conviction obtained by the introduction of perjured testimony violates a defendant's due process rights if (1) the prosecution knowingly solicited the perjured testimony, or (2) the prosecution failed to correct testimony it knew was perjured." *State v. McKinney*, 272 Kan. 331, 339, 33 P.3d 234 (2001) (citing *Napue*, 360 U.S. at 269).

Dinkel fails to meet this test on all accounts. First, the record fails to show that Londono's testimony was false or perjured. Although his credentials may be less impressive than those of Dinkel's expert who testified only *after* Dinkel's trial at the *Van Cleave* hearing, the fact that one person's testimony subsequently contradicts another person's testimony does not compel the conclusion that either person gave false or perjured testimony. Nor does the record support Dinkel's assertion that Londono testified that Dinkel had manipulated or faked the Facebook exhibits. Londono testified about how easy it would be to make a Facebook account in another person's name and what suspicious indicia he saw in the exhibits, but he did not draw the conclusion Dinkel now attributes to him. Secondly, Dinkel fails to show that the State had any knowledge that it was presenting allegedly false evidence through Londono's testimony. See *Haddock v. State*, 282 Kan. 475, 508, 146 P.3d 187 (2006).

Lastly, Dinkel fails to show that her conviction was "obtained by the introduction of perjured testimony." See *McKinney*, 272 Kan. at 339. The convictions could easily have been independently secured by the physical evidence (condoms and stained bedspread), by Dinkel's admissions that she had sexual intercourse with K.H., by her psychologist's testimony that Dinkel had sexual intercourse with K.H., and by the circumstantial evidence showing Dinkel's acts and attitude toward K.H. This evidence not only precludes Dinkel from meeting the *Napue* requirements but also meets the State's burden to show no prejudice from the trial court's admission of Londono's testimony, even had its admission been erroneous. "'Where the evidence of guilt is of such a direct and overwhelming nature that it can be said that [the error] . . . could not have affected the result of the trial, such admission or exclusion is harmless.' [Citation omitted.]" *State v. Hebert*, 277 Kan. 61, 96, 82 P.3d 470 (2004). Such is the case here. We thus find no violation of Dinkel's right to due process.

*The ineffective assistance of counsel claims*

Dinkel argued her ineffective assistance of counsel claims in a *Van Cleave* hearing before the judge who conducted the trial. Because an evidentiary hearing was held, we apply a mixed standard of review—we determine whether the district court's factual findings are supported by substantial competent evidence and review its legal conclusions de novo. *State v. Cheatham*, 296 Kan. 417, 430, 292 P.3d 318 (2013).

*Legal Standard*

The Sixth Amendment right to counsel is the right to the effective assistance of counsel. The benchmark for judging any claim of ineffectiveness is whether counsel's conduct "'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *State v. Gleason*, 277 Kan. 624, 643, 88 P.3d 218 (2004), quoting *Chamberlain v. State*, 236 Kan. 650, 654, 694 P.2d 468 (1985) (adopting *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984]). Judicial scrutiny of counsel's performance must be highly deferential; we must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

Under the *Strickland* test for ineffective assistance of counsel, the defendant must prove that (1) counsel's performance was deficient, and (2) counsel's deficient performance was sufficiently serious to prejudice the defense and deprive the defendant of a fair trial. To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. See *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015). A reasonable probability is a probability sufficient to undermine confidence in the outcome, in light of the totality of the evidence before the jury. *Strickland*, 466 U.S.

at 694. Where the prejudice prong is dispositive, there is no need to evaluate counsel's performance. Such is the case here.

Dinkel has shown no prejudice. Dinkel erroneously presumes that the underlying theory of rape would negate the "essential element of intent." But because the crime charged requires no intent, even a perfectly-presented "mental disease or defect" defense or rape theory showing lack of intent would not have been an adequate legal defense. "A weak or insufficient defense does not indicate ineffectiveness of counsel in a case where a defendant has no defense." *Silvers v. State*, 38 Kan. App. 2d 886, 890-91, 173 P.3d 1167 (2008) (quoting *People v. Ganus*, 148 Ill. 2d 466, 473-74, 594 N.E.2d 211 [1992]). In *Ganus*, counsel was found to be effective where defendant confessed to murdering a fellow inmate and thus had no legal defense, but counsel put on a "compulsion" defense at trial—that the defendant committed the murder under orders from a prison gang. Similarly, Dinkel had no legal defense to the crime of child rape after admitting that she had sexual intercourse with K.H. Dinkel has not shown how proof of her rape theory could have precluded her conviction and thus has not established prejudice.

Moreover, Dinkel's two convictions are not indicative of ineffective assistance of counsel—quite the opposite, in that counsel secured 18 acquittals out of 20 charges. Any failings by counsel are legally harmless. Nonetheless, we will examine below each of the errors Dinkel assigns to counsel.

1. *Failure to hire a computer forensics expert to authenticate the Facebook message*

Dinkel contends trial counsel was constitutionally ineffective by not hiring or calling a computer forensics expert to bolster the authenticity of the Facebook message. Official Facebook records showed that the Facebook message had been deleted from Dinkel's account. The expert Dinkel hired for the *Van Cleave* hearing could thus confirm

22

only that a message had been sent from K.H.'s Facebook account to Dinkel at the time and date shown in the screenshots—he could not testify to its contents. Dinkel has not shown that if counsel had hired an expert to testify at trial, that expert could have done any differently. We find no prejudice resulting from counsel not using an expert at trial.

2. *Failure to call Autumn as a witness*

Dinkel claims that trial counsel was constitutionally ineffective by not interviewing a middle school student who Dinkel said was with her when she received the Facebook message from K.H. Dinkel identified two girls, Amber and Autumn. She told counsel that Amber could testify as to K.H.'s sexual experience with others and Autumn could testify that she was with Dinkel when Dinkel first received the Facebook message and that Dinkel showed the message to her. Counsel admitted that he did not contact the girls before trial. When he interviewed one of them midtrial, he learned that he had confused the girls and that the one he was interviewing could only testify as to K.H.'s sexual experiences and not to the Facebook message.

Neither girl's testimony was exculpatory. We conclude, as above, that counsel's failure to call Autumn to buttress the authenticity of the message did not affect the outcome of the trial. Dinkel's introduction of the Facebook message confirms that she had sexual intercourse with K.H.; thus, counsel's failure to bolster its authenticity cannot be prejudicial error.

3. *Failure to introduce Dinkel's medical records*

Dinkel next contends that trial counsel was ineffective by failing to introduce records from her two physician visits on January 2 and 3, 2013. But at the *Van Cleave* hearing, counsel testified that Dinkel never told him about any visits to a medical

23

provider after December 26. Dinkel does not show otherwise on appeal. Counsel's performance cannot be deficient for failing to obtain records he does not know about.

Nor has Dinkel shown that the medical records support her theory that she was raped. The records show that Dinkel visited a physician on January 2, 2013, and told the physician that she "was sexually active last week on a number of occasions," was separated from her husband, and took the "morning-after" pill because she was not using birth control. But she did not report a sexual assault and the physician did not note any observed physical trauma from the pelvic or genital exams performed. The physician diagnosed her with pyelonephritis, a kidney infection—not a "genital infection" as represented in Dinkel's brief. A second medical record of a follow-up visit likewise contains no information relevant to this case. Dinkel has not shown that the admission of these records could have impacted the outcome of the trial.

4. *Failure to introduce text messages from K.H. to Dinkel*

Dinkel argues that trial counsel was ineffective for not introducing certain texts from K.H. to Dinkel that were important to her theory that K.H. was the manipulator or aggressor in the relationship. However, the defense used other means to paint K.H. as manipulative, aggressive, and blackmailing—demanding that Dinkel purchase items for him and give him large sums of money. Dinkel testified that she did whatever K.H. wanted, including buying him a penis pump. Thus, the texts were not necessary to present her theory. Even assuming that counsel's performance was deficient in this respect, we find no prejudice because Dinkel's defense theories do not apply to the crime of child rape.

5. *Failing to sufficiently prepare and present the psychologist's testimony*

Dinkel next alleges ineffective assistance of counsel because trial counsel did not prepare and present the psychologist's testimony in a manner that would have made it admissible under Kansas law.

Dinkel argues that counsel was ineffective for "failing to make a clear proffer regarding the relevance of rape trauma syndrome—and Hutchionson's other diagnoses— to the defense of mental disease or defect." However, in the report for trial, Hutchinson's diagnoses were PTSD; major depression; and personality disorder not otherwise specified with borderline, avoidant, and dependent traits—not rape trauma syndrome by name. Counsel's efforts to introduce the report were not deficient. The trial court initially barred the psychologist's testimony entirely. When counsel filed a motion to reconsider, the trial court granted it in part, allowing the psychologist to testify as to several topics, including Dinkel's severe anxiety and reluctance to discuss sexual matters. On appeal, Dinkel fails to show the relevance of any of Hutchinson's diagnoses to any mens rea required for child rape.

Dinkel also contends that counsel should have given Hutchinson more information, including: numerous text messages from K.H. to Dinkel to show his manipulation and blackmailing of Dinkel; copies of Facebook and chat messages between K.H. and other girls to show K.H. was sexually aggressive; and Dinkel's medical records because they would have provided objective evidence supporting Hutchinson's psychological conclusions. We have already addressed the substance of these issues above.

6. *Giving the State Dinkel's flip phone*

Dinkel contends her trial counsel was constitutionally ineffective in giving the State one of her cell phones without having investigated its contents and despite not being wholly convinced that the discovery order compelled its production.

Dinkel alleges two forms of prejudice from the production of the phone. First, the State used the texts from the phone to show that Dinkel was defying the court's order that she have no contact with K.H. Dinkel relies on this statement from an Illinois case: "For defense counsel to elicit testimony which provides a critical element of the State's case where the State has not done so [renders the trial unfair]." *People v. Jackson*, 318 Ill. App. 3d 321, 328, 741 N.E.2d 1026 (2000). But this principle does not apply here, even assuming the persuasiveness of this case, because Dinkel was not charged with having violated the no-contact order, and violation of the no-contact order was not an element, let alone a critical element, of the State's child rape case.

Secondly, Dinkel claims prejudice because the texts introduced by the State from her flip phone undercut her theory that she was raped—the prosecutor suggested that a person who had been raped would not buy a "burner phone" and continue to text the alleged rapist. However, Dinkel cannot establish prejudice because the defense theories that she was raped by K.H. and that she acted out of rape trauma are not legal defenses to the crime of child rape.

7. *Failing to impeach K.H.*

Dinkel next contends trial counsel provided ineffective assistance by not trying to impeach K.H. with text messages K.H. had sent to other students in which he bragged of previously having sex. Dinkel argues that the text messages from K.H. to female students

26

would have shown that K.H. was sexually aggressive and would have helped impeach K.H.'s testimony that he did not rape Dinkel.

Even if the text messages could be seen as impeaching, their absence was not prejudicial. K.H. testified that he had sexual intercourse with Dinkel at least 10 times and that she had performed oral sex on him at least 10 times. The jury's acquittal of Dinkel on 18 of the 20 acts charged reflects that it did not believe K.H.'s testimony, even without the potential impeachment the omitted text messages may have provided.

8. *Failing to make a marital privilege objection to Dinkel's husband's testimony*

Dinkel next contends that trial counsel was constitutionally ineffective by not making a marital privilege objection to her husband, Jayson Dinkel's, testimony. Jayson's testimony included communications between him and Dinkel, information about their sexual practices, and observations he had made about Dinkel and K.H.

At the *Van Cleave* hearing, counsel testified that he did not raise a marital privilege objection to Jayson's testimony because he believed that Jayson's testimony would help the defense by showing that Dinkel was in a failing relationship. The district court found that counsel's decision was strategic and thus did not constitute deficient performance.

Dinkel contends that counsel's performance fell below a reasonable standard because he mistakenly believed that the Dinkels' divorce had terminated the marital privilege. Some of the communications that may have been subject to marital privilege showed Dinkel had lied to her husband—Dinkel contends this prejudiced her because the case largely boiled down to whether the jury believed her or believed K.H.

27

This court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). Strategic choices based on a thorough investigation of the law and facts are virtually unchallengeable, and strategic choices based on a less-than-complete investigation are reasonable to the extent that reasonable professional judgment supports the limitation on the investigation. *Flynn v. State*, 281 Kan. 1154, 1157, 136 P.3d 909 (2006).

Counsel may or may not have thoroughly investigated the law relative to marital privilege. See K.S.A. 60-428; 60-423(b); *State v. Glover*, 219 Kan. 54, 57, 547 P.2d 351 (1976). But even assuming that counsel misunderstood the law, we find no deficient performance. Counsel testified that he was aware of the existence of the privilege, that it could be terminated by divorce, that it lay with the defendant, and that nothing in the privilege would prevent Jayson from testifying about what he had seen (non-communicative acts). He discussed the privilege with Dinkel and decided to use Jayson's testimony to bolster their theory that K.H. had raped Dinkel and to explain her odd behavior as, in part, a reaction to Jayson's emotional abuse. His decision was both strategic and reasonable.

Dinkel has not shown prejudice. If Dinkel's credibility was tainted by admission of her lies to her husband, it was not reflected in the jury verdict. The jury convicted her of only two of 20 counts—two counts that were compelled by evidence other than Jayson's testimony, as noted above. Dinkel has not shown a reasonable probability that but for the admission of Jayson's testimony, she would have been acquitted of all 20 charges.

*Was Dinkel Denied Her Constitutional Right to a Fair Trial by the Cumulative Effect of
Errors?*

Lastly, Dinkel argues that cumulative error requires reversal. To prevail upon such a claim, the defendant must demonstrate that two or more errors occurred and that the errors substantially prejudiced the defendant and denied him or her a fair trial. *State v. Houston*, 289 Kan. 252, 277-78, 213 P.3d 728 (2009). Dinkel fails to meet this test.

Affirmed.